IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF GRACE H.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF GRACE H., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

DEBI B., APPELLANT.

Filed December 1, 2015.    No. A-15-349.

Appeal from the Separate Juvenile Court of Lancaster County: REGGIE L. RYDER, Judge. Reversed and remanded with directions.

Mark T. Bestul, of Legal Aid of Nebraska, for appellant.

Joe Kelly, Lancaster County Attorney, and Maureen Lamski for appellee.

PIRTLE, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

Debi B. appeals from the order of the separate juvenile court for Lancaster County adjudicating her minor child, Grace H., pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2014). Upon our de novo review, we find that the State did not prove the allegations against Debi by a preponderance of the evidence. We therefore reverse and remand with directions.

BACKGROUND

Debi is the biological mother of Grace, born in December 2014. Zachary H. is Grace's biological father. Grace was removed from Debi's care at the hospital near the time of her birth.

Debi has three older children: Xavier B., born in July 2003; Alijah B., born in October 2008; and Messiah S., born in September 2012. These children have different fathers. Debi is a party to a separate case in the juvenile court involving her older children, case No. JV12-1242,

- 1 -

which is not the subject of this current appeal. In that case, her children have been removed from her care since October 2012. The proceedings in case No. JV12-1242 formed the basis for Grace's removal in the instant case.

*Proceedings in Case No. JV12-1242.*

In October 2012, Xavier, Alijah, and Messiah were removed from Debi's care and placed in the legal custody of the Nebraska Department of Health and Human Services (DHHS). The State filed a petition alleging that the children were within the meaning of § 43-247(3)(a) by reason of the faults or habits of Debi. The State alleged that Debi and Messiah's father engaged in domestic violence in the presence of the children; Debi had not taken appropriate action to protect the children from exposure to the assaultive behavior; Debi failed to consistently provide the children with a safe and stable home and/or the proper or necessary care, supervision, and protection; and due to the actions of Debi or the situation, the children were at risk of harm. Neither Debi nor Messiah's father would cooperate with DHHS or the Lincoln Police Department when custody of Messiah was changed to DHHS; the three were found at a hotel and forceful entry had to be used in order to obtain physical custody of Messiah, who was one month old at the time. When police entered the hotel room, Messiah was being held by his father who retreated into the hotel bathroom and further resisted turning over Messiah. While police tried to get Messiah away from his father, Debi remained seated on the bed in the hotel room. The allegations against Debi were amended to include that knowing there was an order for protective custody, she failed to allow and/or prevented the Lincoln Police Department or DHHS from gaining custody of Messiah; and that a hair follicle test of Messiah in October tested positive for THC (at the time of Messiah's birth in September, his father had admitted to smoking marijuana daily).

In June 2013, the State filed a motion to terminate Debi's parental rights to Messiah only. The State also filed a motion to terminate the parental rights of Messiah's father.

In July 2013, Xavier, Alijah, and Messiah were adjudicated under § 43-247(3)(a), due to the faults or habits of Debi; Debi pled no contest to the allegations against her. The court continued the legal custody of Xavier and Messiah with DHHS for placement, treatment, and care in out-of-home placements; it appears that Messiah was in a non-relative foster placement, and the record reflects that at some point, Xavier was placed with his maternal grandmother, Joan D. The court found that Alijah was then currently in the physical custody of her father, that she should remain in his physical custody, and that he should have legal custody of Alijah as well.

In August 2013, the juvenile court terminated its jurisdiction over Alijah because she was in the legal and physical custody of her father (via a district court order in a custody proceeding between him and Debi); the State had no objection.

In October 2013, the juvenile court terminated the parental rights of Messiah's father; in a memorandum opinion, *In re Interest of Messiah S.*, No. A-13-1012, 2014 WL 4087887 (Neb. App. August 19, 2014) (selected for posting to court Web site), this court subsequently affirmed the termination of the father's parental rights. However, the juvenile court did not terminate Debi's parental rights to Messiah. The court stated that she had "lots of work to do before she could be safely trusted to parent her children independently," and that "[b]y her own admission, she has never dated a man who did not subject her to domestic violence." The court noted that there were very few concerns reported during her visits, and the vast majority of the visitation notes were

positive and showed a good bond between her and her children and a beneficial relationship. The court noted the DHHS worker's testimony that she had no concerns with Debi's parenting skills and that Debi had been compliant with the many court restrictions. The court was puzzled by DHHS's recommendation that the permanency plan for Xavier was reunification with Debi, but that DHHS recommended Debi's parental rights to Messiah be terminated. The court found that the State did not prove the allegations against Debi by clear and convincing evidence, and thus overruled the motion to terminate Debi's parental rights to Messiah.

In November 2013, the juvenile court issued a disposition order, stating that the primary permanency plan was reunification with an alternative plan for adoption. Xavier and Messiah were to remain in the temporary legal custody of DHHS, and were to remain in an out-of-home placement. The juvenile court ordered Debi to attend supervised parenting time, participate and successfully complete a co-dependency group, and attend individual therapy.

An "order of review of disposition" was issued in February 2014, noting that poor progress had been made to alleviate the causes for out-of-home placement. The court stated that the primary permanency plan was reunification with an alternative plan for guardianship. Xavier and Messiah were to remain in the temporary legal custody of DHHS, and were to remain in an out-of-home placement. Debi's court-ordered requirements remained the same as set forth in the November 2013 disposition order.

Another "order of review of disposition" was issued in April 2014, noting that fair progress had been made to alleviate the causes for out-of-home placement. The court stated that the primary permanency plan was reunification. Xavier and Messiah were to remain in the temporary legal custody of DHHS, and were to remain in an out-of-home placement. In addition to the previous court requirements, Debi was also ordered to follow the rules and regulations of her probation (there is nothing in our record as to why she was on probation or for how long).

In September 2014, the State once again filed a motion to terminate Debi's parental rights to Messiah only. A formal hearing on the contested motion was subsequently set for February 2015.

Another "order of review of disposition" was issued in December 2014, one week before Grace's birth. (We note that despite the pending motion to terminate Debi's parental rights to Messiah, the December 2014 "order of review of disposition" did not distinguish between Xavier and Messiah and seemed to apply to both children.) In the order of review, the juvenile court noted that good progress had been made to alleviate the causes for out-of-home placement. The court stated that the primary permanency plan was reunification, with an alternative plan of adoption. Xavier and Messiah were to remain in the temporary legal custody of DHHS, and were to remain in an out-of-home placement. Debi's court-ordered requirements remained the same as set forth in the April order.

Debi has always had supervised parenting time in case No. JV12-1242, and had not made sufficient progress to have Xavier or Messiah placed in her care--we do not know the status of Debi's relationship with Alijah as Alijah was no longer under the juvenile court's jurisdiction. In the November 2013 disposition order and the April and December 2014 review orders, the juvenile court found that out-of-home placement should continue as return to the home would "likely result in serious emotional or physical harm."

*Proceedings in Current Case.*

On December 18, 2014, in a separately docketed juvenile case, case No. JV 14-1040, the State filed a petition alleging that Grace was a person as defined by § 43-247(3)(a) "by reason of the following facts":

> [Grace] lacks proper parental care by reason of the fault or habits of her mother, **Debi B**[**.**], said juvenile is in a situation dangerous to life or limb or injurious to her health or morals, in that:
>
> A. On or about October 30, 2012, an order placing the temporary legal and physical custody of Messiah S[.], Alijah B[.], and Xavier B[.], siblings of [Grace], was entered in the above case. However, Debi B[.] failed to cooperate with the order as to Messiah S[.] and on or about November 5, 2014 [sic], a warrant to take physical custody and to authorize the Lincoln Police Department to use forceful entry at any time to obtain physical custody of Messiah was signed. Even though Debi B[.] failed to cooperate with said warrant, the Lincoln Police Department was able to take physical custody of said child, Messiah. On or about July 9, 2013, Messiah S[.] and Xavier B[.], siblings of [Grace], were determined to be a juvenile [sic] as described by Neb. Rev. Stat. § 43-247(3)(a) by reason of the faults or habits of their mother, **Debi B**[**.**], in the case filed at Juv. Doc. 12 Page 1242 and the juvenile's [sic] legal custody remained with [DHHS];
>
> B. At the dispositional hearing for Juv. Doc. 12 Page 1242 held on November 7, 2013, the Court continued the temporary legal and physical custody of Messiah S[.] and Xavier B[.] with [DHHS]. Plans to correct the conditions have been adjudicated and were adopted by the court on November 7, 2013; however, at the time of this filing those conditions have not been found to have been corrected;
>
> C. The actions of **Debi B**[**.**] and/or the situation places Grace at risk of harm.

(Emphases in original.) On December 19, 2014, the State filed a motion for ex parte temporary custody of Grace, which was granted by the juvenile court.

On December 23, 2014, Joan D., Grace's biological grandmother, filed a motion for leave to intervene; Joan had physical placement of Grace. All parties subsequently stipulated to Joan being given leave to intervene, the court accepted the stipulation, and Joan was given leave to intervene.

On December 31, 2014, a hearing, the proceedings of which do not appear in our record, was held as to the issue of Grace's temporary custody. On January 7, 2015, the court entered an order continuing Grace's temporary legal and physical custody with DHHS. The court ordered that Debi was to have reasonable rights of supervised visitation with Grace as arranged by DHHS; there is nothing in our record to indicate the frequency or duration of the visits that occurred.

A contested adjudication hearing was held on March 23 and 24, 2015. At the beginning of the adjudication hearing, the court noted that the State wished to file a supplemental petition which had "some allegations" directed towards Grace's father. A hard copy was provided to all parties, and all parties indicated that they were willing to waive formal service. The court stated that the supplemental petition would be filed and set for a docket call/adjudication hearing at a later time.

Neither the supplemental petition, nor any indication of the allegations to be made against Grace's father appear in our record.

As to the adjudication hearing on the original petition, a DHHS caseworker, Debi, and Debi's therapist testified. Additionally, exhibit 15, a CD containing the certified transcript of the pleadings and orders in case No. JV12-1242, was offered and received into evidence. The contents of such transcript were set forth previously in this opinion.

Laura Cronkhite, a DHHS caseworker, testified that she was assigned to work with Debi and her children in June, July, or August 2014, in case No. JV12-1242, and remained the family's caseworker at the time of the current hearing.

On direct examination, Cronkhite testified that when the State filed its petition regarding Grace in December 2014, Debi was participating in individual therapy, attending group therapy with Voices of Hope, working with family support, and having supervised visits with Xavier and Messiah pursuant to case No. JV12-1242. At the time of Grace's birth, Cronkhite was concerned because Debi was still at the supervised visitation level with Xavier and Messiah, and up until Cronkhite took over as the caseworker in summer 2014, Debi had not made any progress towards reunification or correcting the adjudicated issues in their case. DHHS was also concerned about Debi's "dishonesty in the past"; Cronkhite recalled that the most recent incident of dishonesty was prior to her involvement in the case. Cronkhite acknowledged that at the time of filing in Grace's case, Debi was "looking at a jail sentence" of 90 days, which would make her unavailable to parent and provide a safe placement for Grace (there is nothing in our record to show why Debi was "looking at a jail sentence"). Cronkhite testified that DHHS did not believe it was in Grace's best interest to place her in Debi's home because the issues leading to adjudication in case No. JV12-1242 had not been corrected.

On cross-examination, Cronkhite testified that since she took over the case in summer 2014, Debi had made progress in case No. JV12-1242; Debi had consistently gone to individual therapy and shown appropriate parenting skills when around her children. Cronkite testified that according to Debi's therapist, Debi was doing well and nothing was reported by the therapist that gave Cronkhite concern. No incidents during Debi's parenting time with any of her children had been reported to Cronkhite. And Cronkhite testified that she had "not seen any negative parenting skills or any concerns." Cronkhite testified that since the 2012 incident at the hotel, there had not been any further incidents involving Debi and Messiah's father.

Cronkhite testified that in December 2014, she had not received any concerns in the visitation notes in case No. JV12-1242 that would suggest Debi would not be able to appropriately provide for Grace. Cronkhite testified that she believed Debi had the ability to make appropriate decisions, but that DHHS felt that due to a lack of progress in case No. JV12-1242, Debi still had things to work on in order to ensure that she could provide safety for her children.

Cronkhite testified that at the time of filing on December 18, 2014, she did not believe Grace would have been safe remaining in Debi's care; she believed Grace was at risk of harm due to Debi's past decision making and her lack of progress in individual therapy until "a couple months ago." Cronkhite then testified that Debi started making progress in therapy between February and April 2014. When asked how much time making progress was needed to make Cronkhite feel comfortable that children would be safe with their parents, Cronkhite responded "consistent positive visitation notes that we've been getting. Consistent, positive notes from the

therapist and just consistent honesty from [Debi] which the Department I guess does not believe that has happened." Cronkhite then acknowledged that she had not ever read any visitation notes that had been concerning in the past two years. She further acknowledged that there had been positive reports from Debi's therapist since around February 2014. And with regards to honesty, Cronkhite said that the most recent issue occurred before she took over the case. When asked what harm she felt would happen to Grace if she remained in Debi's care in December 2014, Cronkhite said "I don't think the Department knows specifically what kind of harm would have came [sic] to the child. We were just ensuring that harm itself did not come to the child."

Cronkhite testified that Debi had a history of domestic violence with Xavier's father, Alijah's father (Debi was the perpetrator in that relationship), and Messiah's father. Cronkhite testified that prior to her involvement in the case, Debi showed up to court once with a black eye and said she fell; however DHHS believed that Debi had been in an altercation with Grace's father. Cronkhite did not know if DHHS investigated the incident, but said no charges were filed. Cronkhite testified that in December 2014, Debi was not at risk of domestic violence by Grace's father.

Debi testified that in December 2014, she had the skills to prevent the events that led to the 2012 hotel incident involving Messiah. Debi testified that she had worked with a therapist on boundary setting, dealing with her anger in an appropriate way, and making sure she had appropriate relationships. Debi testified she no longer had co-dependency or anger issues. Debi testified that at the time of the hearing she had been incarcerated for almost one month and was scheduled to be released in one more month (there is nothing in the record to show why Debi was incarcerated). Debi testified that if she had not been incarcerated she would still be in therapy. Debi testified that if the juvenile court dismissed the allegations against her in Grace's case, Grace could stay with Debi's mother until Debi's release.

Kera Frederick, a licensed independent mental health practitioner, had been working with Debi weekly from December 2013 until Debi was incarcerated in February 2015. Frederick testified that Debi was initially defensive in therapy, but her defensiveness gradually decreased and Debi began to accept her issues and make necessary changes. Frederick authored two letters updating DHHS on Debi's progress; both letters were received into evidence. In her September 2014 letter, Frederick stated that Debi was making "significant progress" in her therapeutic goals including anger management, mood stability, and identification of healthy versus unhealthy relationships. The letter stated that they were working on a safety plan for when Messiah's father was released from prison. In her November 2014 letter, Frederick stated that Debi had been "very actively involved in her sessions" and had been "diligently working on creating a safe environment for herself and her children." Frederick stated that Debi had "worked hard on building and following a safety plan related to [Messiah's father's] release and the potential threat of further negative behavior towards her and her children." At the hearing, Cronkhite testified that Messiah's father had been released from prison; appropriate safety measures were put in place; and Debi actively participated in those safety measures and was able to express insight into what she needed to do regarding safety. Frederick testified that at the time of Grace's birth, she believed that Debi had adequately resolved the issues of domestic violence in her life.

Frederick testified that she and Debi continued to address Debi's mood and stability--there had been "lots of anxiety and depression over Grace not being placed with her," and "a great deal

of anxiety over relinquishment of -- of her son"--but that she was responding to those stresses in an appropriate manner. (We note that this is the only reference of relinquishment in our record. Both Xavier and Messiah had been adjudicated. And there had been a motion to terminate Debi's parental rights to Messiah.) Frederick testified that Debi still needs individual therapy and has things to work on, but Frederick had no concerns about Debi's ability to parent.

In its 20-page order filed on March 25, 2015, the juvenile court spent 13 pages quoting its findings from its October 2013 order in case No. JV12-1242 terminating the parental rights of Messiah's father, but overruling the motion to terminate Debi's parental rights to Messiah. The juvenile court then said:

> It is acknowledged that [Debi] has made progress in the case found at JV12-1242 since that time. However, even as of the most recent review hearing, which was held only days before giving birth to Grace H[.], all of her three older children were still placed outside of her home. In addition, her visitation with those children was still at the fully supervised level. In fact, at no time during the years that the JV12-1242 case has been pending has [Debi] had any of her children returned to her care nor has her level of visitation ever been less restrictive than fully supervised. She has not corrected the conditions adjudicated in that case. "A juvenile court need not wait until disaster has befallen a minor child before the court may acquire jurisdiction; if it is reasonable to assume that injury will occur absent action by the court, then the court may assume jurisdiction and act accordingly." In re Interest of Joshua M., 251 Neb. 614, 558 N[.]W[.]2d 548 (1997). Just as the older children are at risk of harm, so is baby Grace.

The juvenile court found that the allegations in the petition had been proven by a preponderance of the evidence and adjudicated Grace to be within the meaning of § 43-247(3)(a). The court found that Grace should remain in the custody of DHHS.

Debi now appeals.

## ASSIGNMENT OF ERROR

Debi assigns that the juvenile court erred in determining that Grace was a juvenile within the meaning of § 43-247(3)(a) and entering an order taking jurisdiction of Grace because the State did not meet its burden of proof.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

## ANALYSIS

Under the juvenile code, the juvenile court may take jurisdiction of:

> Any juvenile . . . who lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian; . . . or who is in a situation or engages in an

occupation, including prostitution, dangerous to life or limb or injurious to the health or morals of such juvenile . . .

§ 43-247(3)(a). The purpose of the adjudication phase is to protect the interests of the child. *In re Interest of Cornelius K.*, 280 Neb. 291, 785 N.W.2d 849 (2010). At the adjudication stage, in order for a juvenile court to assume jurisdiction of a minor child under § 43-247(3)(a), the State must prove the allegations of the petition by a preponderance of the evidence, and the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of § 43-247. *In re Interest of Cornelius K., supra*. While the State need not prove that the juvenile has actually suffered physical harm, at a minimum, the State must establish that without intervention, there is a definite risk of future harm. *In re Interest of Taeven Z.*, 19 Neb. App. 831, 812 N.W.2d 313 (2012).

In its petition, the State's allegations that Grace was within the meaning of § 43-247(3)(a) and at risk of harm were all related to case No. JV12-1242: Debi's failure to cooperate with DHHS's efforts to take physical custody of Messiah; the adjudication of Xavier and Messiah by the reason of the faults or habits of Debi; and Debi's progress, or lack thereof, in correcting the conditions leading to the adjudication of Xavier and Messiah. Additionally, in Cronkhite's December 2014 affidavit in support of temporary custody of Grace, she recounted the reason for the October 2012 removal of Debi's older children, the allegations that they were exposed to domestic violence, and that Messiah had to be forcefully removed from Debi and his father. Cronkhite then stated:

> [Debi's] other two children, Messiah and Xavier, remain in the legal custody of [DHHS] and are at the fully supervised level of visitation and have been since the beginning of this case. The children have been in out-of-home placements since at least October of 2012 and are doing well.

> At this time, [DHHS] is concerned with [Debi's] ability to make safe choices for Grace H[.] It would not be in Xavier B[.]'s or Messiah B[.]'s best interest to be returned to their mother's home at this point due to [Debi's] inability to provide safety and appropriate parenting. Therefore, it would not be in Grace H[.]'s best interest, at this point, to remain in the custody of [Debi]; [DHHS] cannot maintain safety with the child in the home.

Thus, it is clear the events that occurred in case No. JV12-1242 were the State's sole basis for seeking an adjudication of Grace.

The juvenile court therefore relied on case No. JV12-1242 as the basis for concluding that Grace was at risk of harm. In its order adjudicating Grace and taking jurisdiction, the juvenile court filled 13 pages quoting its findings from its October 2013 order in case No. JV12-1242. In that order, the juvenile court terminated the parental rights of Messiah's father, but overruled the motion to terminate Debi's parental rights to Messiah. The court noted that Debi had made progress in case No. JV12-1242 since that time. However, the court also said that even as of the most recent review hearing, held only days before Grace's birth, all of Debi's older children were still placed outside of her home, her visits with them remained fully supervised, and Debi had not corrected the conditions adjudicated in that case. The juvenile court said, "Just as the older children are at risk of harm, so is baby Grace." However, on our de novo review, we find that the evidence at the

- 8 -

adjudication hearing in the current case showed that despite the ongoing proceedings in case No. JV12-1242, there was no evidence to show that Grace was at risk of harm.

It is true that Debi has been involved in serious domestic violence situations that resulted in the removal of her three older children in case No. JV12-1242. In the July 2013 adjudication order in that case, Debi pled no contest to the allegations against her, including that she and Messiah's father engaged in domestic violence in the presence of the children; she had not taken appropriate action to protect the children from exposure to the assaultive behavior; she failed to consistently provide the children with a safe and stable home and/or the proper or necessary care, supervision, and protection; and knowing there was an order for protective custody, she failed to allow and/or prevented the Lincoln Police Department or DHHS from gaining custody of Messiah.

The record reveals that in addition to a history of domestic violence with Messiah's father, Debi also had a history of domestic violence with Xavier's father and Alijah's father (Debi was the perpetrator in that relationship). And in the juvenile court's October 2013 order in case No. JV12-1242, wherein the court did not terminate Debi's parental rights to Messiah, the court said "[b]y her own admission, [Debi] has never dated a man who did not subject her to domestic violence."

However, despite Debi's history of domestic violence in these past relationships, there was no evidence of any recent or ongoing domestic violence issues affecting Debi at the time Grace was born. There was no evidence of any recent or ongoing domestic violence issues between Debi and Xavier's father. In case No. JV12-1242, Xavier's father pled no contest to allegations that he had known for over 7 years that Xavier was his child, and that he had failed to maintain consistent contact with Xavier, failed to provide for Xavier's needs, and/or failed to put himself in a position to assume custody of Xavier. As of the December 2014 order of review, Xavier's father was still having supervised visitation with him. There is nothing in our record to show that there was a pending motion to terminate the parental rights of Xavier's father. And based on our de novo review of the record, there was no evidence of any recent or ongoing domestic violence issues between Xavier's father and Debi at the time of Grace's birth in December 2014.

As to Debi's relationship with Alijah's father, the record reflects that prior to any juvenile court filings in case No. JV12-1242, Alijah's father and Debi were parties to a custody case in district court. In March 2012, the district court for Lancaster County adopted the parties' stipulation for joint legal and physical custody of Alijah. In August 2013, the juvenile court terminated its jurisdiction over Alijah in case No. JV12-1242 because her father had temporarily been awarded sole legal and physical custody over Alijah in district court; Debi was to have supervised parenting time as arranged and agreed to by the parties. Accordingly, based on our de novo review of the record, there were clearly no recent or ongoing domestic violence issues between Alijah's father and Debi at the time of Grace's birth in December 2014.

With regard to Messiah's father, the juvenile court terminated his parental rights in October 2013, and this court affirmed that decision. The testimony at the adjudication in Grace's case was that there had been no incidents between Debi and Messiah's father since 2012, although he had been incarcerated for much of the time since 2012. In her November 2014 letter, Debi's therapist stated that Debi had been "diligently working on creating a safe environment for herself and her children." The therapist stated that Debi had "worked hard on building and following a safety plan related to [Messiah's father's] release and the potential threat of further negative behavior towards

- 9 -

her and her children." At the hearing Cronkhite testified that Messiah's father had been released from prison; appropriate safety measures were put in place; and Debi actively participated in those safety measures and was able to express insight into what she needed to do regarding safety. By all accounts, Debi has put an appropriate safety plan in place. Accordingly, the record reflects that the domestic violence issues with Messiah's father have been addressed.

Finally, there was no evidence of any recent or ongoing domestic violence issues between Grace's father and Debi. Cronkhite did testify that prior to her involvement in the case, Debi showed up to court once with a black eye and said she fell (no specific date was given for when this occurred); DHHS believed that Debi had been in an altercation with Grace's father. Cronkhite did not know if DHHS investigated the incident, but said no charges were filed. Significantly, Cronkhite testified that in December 2014, Debi was not at risk of domestic violence by Grace's father. Based on our de novo review of the record, other than some speculation about a black eye on one occasion at an unspecified point in time, there was no evidence of any domestic violence issues between Grace's father and Debi.

To summarize, other than some speculation about Grace's father giving Debi a black eye at an unspecified point in time, the most recent incident of domestic violence involving Debi was the November 2012 hotel incident with Messiah's father. Accordingly, the record is clear that there was no evidence of any recent or ongoing domestic violence issues affecting Debi at the time Grace was born in December 2014.

The State, DHHS, and the juvenile court all believe that Grace should be adjudicated because Debi had failed to correct the conditions leading to the adjudication of her children in cases No. JV12-1242, those children remain at a fully supervised level of visitation, and because one week prior to Grace's birth, the court found that returning Xavier and Messiah to Debi's home "would likely result in serious emotional or physical harm." However, in its December 2014 order of review in case No. JV12-1242, the juvenile court did not elaborate as to why returning Xavier and Messiah would likely result in harm; and any thoughts on the court's reasoning would be mere speculation on our part.

The evidence presented at the adjudication hearing in Grace's case established that Debi had made progress in addressing the domestic violence issues which formed the basis for adjudication in case No. JV12-1242. As stated previously, there were no recent or ongoing issues of domestic violence between Debi and the fathers of Xavier or Alijah. And the domestic violence issues with Messiah's father, which were at the center of case No. JV12-1242, have been addressed. As stated previously, Debi has put an appropriate safety plan into place. Furthermore, Messiah is not living with Debi, and his father's parental rights have been terminated. Accordingly, upon our de novo review of the record, we fail to see how issues regarding Messiah's father place Grace at risk of harm. Of significance in this case is that Debi's therapist testified that at the time of Grace's birth, she believed Debi had adequately resolved the issues of domestic violence in her life. And even Cronkhite testified that Debi was not at risk of domestic violence by Grace's father.

Having addressed concerns related to domestic violence as a basis for the juvenile court to find that Grace was at risk of harm, we move on to the other concerns raised at the adjudication hearing in Grace's case. At the time of Grace's birth, Cronkhite was concerned because Debi was still at the supervised visitation level with Xavier and Messiah, and up until Cronkhite took over as the caseworker in summer 2014, Debi had not made any progress towards reunification or

correcting the adjudicated issues in their case. However, by all accounts, at the time of Grace's birth in December 2014, Debi had been making progress in case No. JV12-1242. She regularly attended individual therapy and the therapist testified that Debi was making "significant progress" in her therapeutic goals. Cronkite testified that nothing was reported by the therapist that gave Cronkhite concern, and she had received positive reports from Debi's therapist since February 2014. No incidents during Debi's parenting time with any of her children had been reported to Cronkhite. And Cronkhite testified that she had "not seen any negative parenting skills or any concerns." Cronkhite also said that she had not received any concerns in the visitation notes in case No. JV12-1242 that would suggest Debi would not be able to appropriately provide for Grace. Cronkhite further testified that she believed Debi had the ability to make appropriate decisions. And the therapist had no concerns about Debi's ability to parent. Furthermore, as noted by Debi's counsel at oral argument, Debi cannot appeal the ongoing supervised visitation level in case No. JV12-1242; so even if the record does not support what DHHS and the court are doing in that case, Debi cannot do anything about it at this time. See *In re Interest of Tayla R.*, 17 Neb. App. 595, 767 N.W.2d 127 (2009) (in juvenile cases, where an order from a juvenile court is already in place and a subsequent order merely extends the time for which the previous order is applicable, the subsequent order by itself does not affect a substantial right and does not extend the time in which the original order may be appealed; thus, a dispositional order which merely continues a previous determination is not an appealable order).

We note that Cronkhite acknowledged that at the time of filing in Grace's case, Debi was "looking at a jail sentence" of 90 days, which would make her unavailable to parent and provide a safe placement for Grace (there is nothing in our record to show why Debi was "looking at a jail sentence"). Debi testified that at the time of the hearing she had been incarcerated for almost one month and was scheduled to be released in one more month (again there is nothing in the record to show why Debi was incarcerated). Debi testified that if the juvenile court dismissed the allegations against her in Grace's case, Grace could stay with Debi's mother (who already had placement of Grace via DHHS) until Debi's release. The State failed to put on evidence as to why Debi was in jail. The State also failed to show that Debi's jail term would pose a "definite risk of harm" to Grace, especially considering that Debi had found an appropriate caregiver for Grace until her release. Given the evidence before us, or rather the lack of evidence, we fail to see how Debi's brief jail term supports the adjudication of Grace.

As we have stated previously, it is clear the events that occurred in case No. JV12-1242 were the State's sole basis for seeking an adjudication of Grace. In its brief, the State cites to *In re Interest of Andrew S.*, 14 Neb. App. 739, 749, 714 N.W.2d 762, 769-70 (2006), wherein we held that "one's history as a parent is a permanent record and may serve as a basis for adjudication depending on the circumstances." In *Andrew S.*, the parents voluntarily relinquished their parental rights to their two daughters to get a "clean slate" with their unborn son. Prior to the parental relinquishments, the daughters had been in DHHS's custody for more than two years and the parents had not corrected the conditions leading to adjudication because they had failed and/or refused to complete court ordered requirements. We rejected the notion of a "clean slate" and said to ignore the fact that the parents chose to relinquish their rights as to their first two children "would be folly on our part" and would unnecessarily expose the son, who was born a mere three months later, to a risk of harm. *Id.* at 749, 714 N.W.2d at 770. We agree that a prior adjudication of older

siblings may be considered, however, this case is distinguishable from our concerns in *In re Interest of Andrew S., supra*. In the present matter, Debi has fully participated in her court-ordered requirements in case No. JV12-1242, and there is no evidence that Grace is at risk of harm.

This case is more akin to *In re Interest of Justine J. et al.*, 286 Neb. 250, 835 N.W.2d 674 (2013). In *Justine J.*, Shawna was the biological mother of four children, two girls and two boys. The girls lived with Shawna and her husband. The boys lived with their grandparents. The juvenile court adjudicated all four children after the girls had been exposed to Shawna's and her husband's drug use and domestic violence. Shawna did not appeal the adjudication of the girls, but did appeal the adjudication of the boys. The Nebraska Supreme Court found that there was no evidence that the boys were present for Shawna's and her husband's drug use or domestic violence and held that, although there was sufficient evidence to adjudicate the girls, "the State failed to prove by a preponderance of the evidence an evidentiary nexus between the neglect suffered by [the girls] and any definite risk of future harm to [the boys]." *In re Interest of Justine J. et al.*, 286 Neb. at 255, 835 N.W.2d at 679. The Nebraska Supreme Court reversed the adjudication order concerning the boys and remanded the cause with directions to dismiss the petition as to them. In our case, not only was Grace not present during the domestic violence at issue in case No. JV12-1242, she was not yet born. And similar to *Justine J.*, the State in our case failed to prove by a preponderance of the evidence an evidentiary nexus between the neglect suffered by Debi's older children in case No. JV12-1242 and any definite risk of future harm to Grace.

The record establishes that Debi had attended individual therapy on a weekly basis since December 2013. Debi testified that she had worked with a therapist on boundary setting, dealing with her anger in an appropriate way, and making sure she had appropriate relationships. Debi testified she no longer had co-dependency or anger issues. Debi's therapist believed that Debi had adequately resolved the issues of domestic violence in her life. And Cronkhite testified that Debi was not at risk of domestic violence by Grace's father. Cronkhite testified that she believed Debi had the ability to make appropriate decisions. And the therapist had no concerns about Debi's ability to parent. When Cronkhite was asked what harm she felt would happen to Grace if she remained in Debi's care, Cronkhite testified that she did not know. Upon our de novo review, we cannot say that Grace was at a definite risk of harm or that she lacked proper parental care due to Debi's fault or habits. We find that the State did not prove the allegations against Debi by a preponderance of the evidence. Accordingly, we reverse the juvenile court's adjudication of Grace.

## CONCLUSION

For the reasons stated above, we reverse the juvenile court's adjudication of Grace. We therefore remand the matter with directions to dismiss the petition.

REVERSED AND REMANDED WITH DIRECTIONS.